UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                    :

UNITED STATES OF AMERICA    :
                    :

       - v. -     :
                    :

MANUEL GEOVANNY        :
RODRIGUEZ-PEREZ,       :     S12 10 Cr. 905 (LTS)
  a/k/a "Manny,"     :
  a/k/a "Shorty,"    :
  a/k/a "Andres Garcia," :
et al.             :
         Defendants.  :

- - - - - - - - - - - - - - - X
                    :

UNITED STATES OF AMERICA    :
                    :

       - v. -     :     S20 10 Cr. 905 (LTS)
                    :

MANUEL GEOVANNY        :
RODRIGUEZ-PEREZ,       :
  a/k/a "Manny,"     :
  a/k/a "Shorty,"    :
  a/k/a "Andres Garcia," :
and JOSE MANUEL ESPINAL, :
                    :
         Defendants.  :

- - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

               PREET BHARARA
               United States Attorney for the
               Southern District of New York
               One St. Andrew's Plaza
               New York, New York 10007

Sarah E. McCallum
Amie N. Ely
Sarah E. Paul
Assistant United States Attorneys
-Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . .1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.   THE GENESIS OF THE INVESTIGATION . . . . . . . . . 3

    II.  THE WIRETAPS . . . . . . . . . . . . . . . . . 6

        A.   The First Rodriguez Phone . . . . . . . . . . 6

        B.   The Second Rodriguez Phone . . . . . . . . . 11

        C.   The Remaining Narcotics Phones . . . . . . . 12

        D.   The Rodriguez Money Phone . . . . . . . . . 16

        E.   The Espinal Phone . . . . . . . . . . . . . 18

    III. THE CHARGES . . . . . . . . . . . . . . . . . . 21

    IV.  THE MOTIONS . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 24

    I.   THE COURT SHOULD DENY THE DEFENDANTS' MOTIONS TO
        SUPPRESS THE WIRETAP EVIDENCE FOR FAILURE TO
        ADEQUATELY DEMONSTRATE NECESSITY . . . . . . . . . 24

        A.   Applicable Law . . . . . . . . . . . . . . . 24

        B.   Discussion . . . . . . . . . . . . . . . . . 27

    II.  THE COURT SHOULD DENY RODRIGUEZ'S MOTION TO
        DISMISS COUNT TWO . . . . . . . . . . . . . . . . 40

        A.   The Government is Permitted to Proceed on
            Multiplicitous Counts Until Sentencing . . . . 40

        B.   Count Two is Sufficiently Pleaded . . . . . . 42

    III. THE COURT SHOULD DENY RODRIGUEZ'S MOTION FOR
        UNSPECIFIED RELIEF, TO INCLUDE A HEARING, ON HIS
        SUSPICION CONCERNING A DEPUTY U.S. MARSHAL . . . . 43

IV.   THE GOVERNMENT AGREES THAT COUNT THREE SHOULD BE
      SEVERED FROM COUNTS ONE AND TWO OF THE S20
      INDICTMENT . . . . . . . . . . . . . . . . . . . .   44

V.    THE GOVERNMENT AGREES TO SUPPLY NOTICE PURSUANT TO
      RULES 404(B), 609(B), AND 807(B), EXPERT NOTICE,
      AND A TENTATIVE EXHIBIT LIST WITH ANY RELEVANT
      TRANSLATIONS OF RECORDINGS SIX WEEKS IN ADVANCE OF
      TRIAL . . . . . . . . . . . . . . . . . . . . . . .   44

VI.   THE COURT SHOULD DENY THE MOTIONS SEEKING EARLY
      DISCLOSURE OF COOPERATOR IDENTITIES AND JENCKS ACT
      AND *GIGLIO* MATERIALS . . . . . . . . . . . . . . .   46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . .   48

## TABLE OF AUTHORITIES

Franks v. Delaware,
        438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . 31

Giglio v. United States,
        405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . 46

United States v. Bejasa,
        904 F.2d 137 (2d Cir. 1990) . . . . . . . . . . . . . 46

United States v Bernardino,
        No. 07 Cr. 151 (PKC),
        2007 WL 4462176 (S.D.N.Y. Dec. 17, 2007) . . . . . . . . 33

United States v. Bianco,
        998 F.2d 1112 (2d Cir. 1993) . . . . . . . . . . . . . 26

United States v. Castellaneta,
        No. 06 Cr. 684 (GEL),
        2006 WL 3392761 (S.D.N.Y. Nov. 20, 2006) . . . . . . . . 43

United States v. Concepcion,
        579 F.3d 214 (2d Cir.2009) . . . . . . . . . 25, 26, 27, 37

United States v. Coppa,
        267 F.3d 132 (2d Cir. 2001) . . . . . . . . . . . . . 47

United States v. Diaz,
        176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . 25, 26

United States v. Fazio,
        No. 11 Cr. 873 (KBF),
        2012 WL 1195157 (S.D.N.Y. April 6, 2012) . . . . . . . . 33

United States v. Fury,
        554 F.2d 522 (2d Cir. 1977) . . . . . . . . . . . . . 26

United States v. Gasparik,
        141 F. Supp. 2d 361 (S.D.N.Y. 2001) . . . . . . . . . . 46

iii

United States v. Gigante,
    979 F. Supp. 959 (S.D.N.Y. 1997) . . . . . . . . . . 33, 35

United States v. Gupta,
    No. 11 Cr. 907 (JSR),
    2012 WL 1066804 (S.D.N.Y. Mar. 27, 2012) . . . . . . . . 41

United States v. Jimenez,
    No. 10 Cr. 316 (VM),
    2011 WL 308401 (S.D.N.Y. Jan. 28, 2011) . . . . . . . . 29

United States v. Josephberg,
    459 F.3d 350 (2d Cir. 2006) . . . . . . . . . . . . . . 41

United States v. King,
    No. 10 Cr. 122 (JGK),
    2011 WL 1630676 (S.D.N.Y. Apr. 27, 2011) . . . . . . . . 48

United States v. Lombardo,
    No. 98 Cr. 1180 (DLC),
    1999 WL 305096 (S.D.N.Y. May 14, 1999) . . . . . . . . . 35

United States v. Miller,
    116 F.3d 641 (2d Cir. 1997) . . . . . . . . . . . . . .27, 31

United States v. Rodriguez,
    496 F.3d 221 (2d Cir. 2007) . . . . . . . . . . . . . . 46

United States v. Seabrook,
    No. 10 Cr. 87 (DAB),
    2010 WL 517 4353 (S.D.N.Y. Dec. 14, 2010) . . . . . . . 47

United States v. Shabani,
    513 U.S. 10 (1994) . . . . . . . . . . . . . . . . . . . 42

United States v. Shipp,
    568 F. Supp. 980 (S.D.N.Y. 1984) . . . . . . . . . . . . 34

United States v. Torres,
    901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . 26

<u>United States</u> v. <u>Tramunti</u>,
     513 F.2d 1087 (2d Cir. 1975) . . . . . . . . . . . . . . 42

<u>United States</u> v. <u>Treacy</u>,
     No. 08 Cr. 0366 (RJC),
     2009 WL 47496 (S.D.N.Y. Jan. 8, 2009) . . . . . . . . . 42

<u>United States</u> v. <u>Walsh</u>,
     194 F.3d 37 (2d Cir. 1999) . . . . . . . . . . . . 42, 43

<u>United States</u> v. <u>Yannotti</u>,
     541 F.3d 112 (2d Cir. 2008) . . . . . . . . . . . 26, 27

**PRELIMINARY STATEMENT**

Defendants Manuel Geovanny Rodriguez-Perez, a/k/a "Manny," a/k/a "Shorty," a/k/a "Andres Garcia" ("Rodriguez") and Jose Manuel Espinal ("Espinal") have filed motions to suppress evidence obtained pursuant to Title III wiretaps, on the ground that the Government failed sufficiently to demonstrate, in its applications for the wiretaps, that "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried."  18 U.S.C. § 2518(3)(c).  These challenges should be rejected.  Thirteen separate judges sitting in the Southern District of New York, including this Court, authorized intercepts over Rodriguez's various cellular phones, all based on the necessity showing that Rodriguez now seeks to impugn.  Rodriguez's argument that the independent judgments of each of these judicial officers should be overturned rests, alternately, on (1) apparent confusion over the use of certain terms (such as "confidential informant" and "surveillance") and (2) a misplaced insistence that the Government was required to exhaust all conceivable investigative leads before seeking authorization for a Title III intercept.

Espinal, in challenging authorizations issued by the Honorable Loretta A. Preska, the Honorable George B. Daniels, and the Honorable Richard J. Sullivan for wiretaps over two telephones he and Rodriguez used to communicate with one another

about their money laundering activities, likewise insists upon a
necessity showing not required by law, and would have this Court
find vagueness and contradiction in the Government's
applications for the intercepts where neither, in fact, exists.

Most of the other motions addressed herein lack merit
as well.  Rodriguez's motions to dismiss Count Two of
Superseding Indictment S12 10 Cr. 905 (LTS) (the "S12
Indictment") for lack of particularity and for multiplicity are
barred by governing precedent.  Count Two charges something akin
to a lesser-included charge of Count One; it charges Rodriguez
with having conspired with a subset of the participants named in
Count One to achieve the same object (trafficking in 1,000
kilograms and more of marijuana),[1] over the same timeframe (1992
to October 2010), as alleged in Count One.  Contrary to
Rodriguez's assertions, the Government is permitted to proceed
on these multiplicitous counts up until sentencing.  At the same
time, the multiplicity of the counts defeats any suggestion that
Count Two lacks particularity, because the facts alleged in
support of Count One, to the extent they pertain to defendants
named in Count Two, give Rodriguez more than ample notice of the
factual predicate underlying Count Two.

---

[1] Rodriguez claims in his Memorandum of Law in Support of Motion
to Suppress, filed December 21, 2011 ("Rodriguez Mem."), that
the Government has charged him with conspiring to traffic "more
than 10,000 pounds of marijuana."  That is not the charge.

Finally, Rodriguez's motion for unspecified relief, to include a hearing, stemming from his suspicion that a Deputy U.S. Marshal whom he has encountered in the courthouse, and who was once his neighbor, entered into his home surreptitiously during the course of the investigation of this case should be denied. Rodriguez alleges no facts, and the Government is aware of none, supporting this suspicion.

Only Espinal's motion to sever Count Three of Superseding Indictment S20 10 Cr. 905 (LTS) (the "S20 Indictment") and certain aspects of Rodriguez's request for a pretrial disclosure order (which is echoed in part in motions by defendants Daniel Fernandez and Oscar Rodriguez, a/k/a "Chang," a/k/a "Chan") have some merit. The Government's proposals with respect to these motions are set forth below.

## BACKGROUND

### I.    THE GENESIS OF THE INVESTIGATION

In about February 2009, the Department of Homeland Security's Immigration and Customs Enforcement Agency ("ICE"), which is now known as Homeland Security Investigations ("HSI"), and other federal agencies began investigating a narcotics trafficking and money laundering organization that was distributing large quantities of marijuana throughout the greater New York City area (the "Organization"). (See Affidavit of Special Agent Jason S. Samuels in Support of Application for

3

Authorization to Intercept Wire Communications, dated January 7, 2010 ("Samuels Aff.") ¶ 15.)   The marijuana was coming in truckloads from Florida, and marijuana trafficking proceeds were being transported back to Florida and elsewhere via trucks, other vehicles, and airplane couriers.

As the investigation would soon reveal, Rodriguez was one of the highest-level members in the Organization.  (See Samuels Aff. ¶ 21.)  He controlled multiple distribution points throughout the Washington Heights and Inwood neighborhoods in Manhattan.  (Id.)

In May 2009, a judge from the Supreme Court of the State of New York, Special Narcotics Courts, County and City of New York (the "SNC") authorized interception of communications over a telephone used by William Alcibio Delgado, a/k/a "Mejor" ("Delgado"), an individual who would later be charged in this case.  (Samuels Aff. ¶ 17.)  The same judge, later in 2009, authorized interception of communications over two other phones used by Delgado, and over cell phones used by Richard Jimenez-Perez, a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago," Jose Ramon Perez, and Ariel Pena, a/k/a "Bin," a/k/a "Vin" - all of whom would, like Delgado, end up charged in this case - and by Kenneth Pena, who would be charged in a related case brought by the Office of the Special Narcotics Prosecutor for the City of New York.  (Id.)

4

Meanwhile, in November and December 2009, the Honorable Deborah A. Batts and the Honorable John F. Keenan, of this District, authorized interception of communications over cell phones used by Osmel Vazquez, a/k/a "Omel," another defendant in this case. (Id.)

Rodriguez was not identified as a target of the investigation until in or about early December 2009, at which time the wiretaps authorized in late 2009, combined with physical surveillance of Rodriguez in December 2009, revealed that Rodriguez used cell phone communications to conduct narcotics trafficking with some of the previously-identified targets. (See Samuels Aff. ¶ 22; see, e.g., Affidavit of Jason S. Samuels in Support of Application for Authorization to Intercept Communications, dated Nov. 16, 2009 (application for wire over Vazquez's phone that does not identify Rodriguez as a target).) Specifically, interceptions over Kenneth Pena's phone in November and early December 2009 revealed that he and his brother Ariel Pena, a/k/a "Bin," a/k/a "Vin," were arranging with a person later identified as Rodriguez to conduct a narcotics transaction and then for payment of $25,000 in connection with that transaction. (Id.) On December 3, 2009, the person who would be identified as Rodriguez agreed to meet Pena "on 82 and Amsterdam" in Manhattan. (Samuels Aff. ¶ 22(d).) The same day, agents watched as Pena met with

5

Rodriguez in the vicinity of Amsterdam Avenue and 80th Street in Manhattan, and conducted a stop of the vehicle Rodriguez was driving.  (Samuels Aff. ¶¶ 24-25.)  The license that Rodriguez handed to agents in connection with this stop identified him. (Samuels Aff. ¶ 26.)  On the floor behind the driver's seat of the vehicle, the agents found a black plastic bag containing approximately $25,000.  (Samuels Aff. ¶¶ 26-29.)  Rodriguez told agents that the money was from a restaurant and was "legit." (Samuels Aff. ¶ 27.)  The agents then allowed Rodriguez to leave, to further the investigation.

## II.  THE WIRETAPS

### A.  The First Rodriguez Phone

On January 7, 2010, the Government sought authorization to intercept communications over the cell phone that Rodriguez had used to arrange the December 3, 2009 $25,000 payment from Kenneth Pena.  In support of the application, the Government, through the Affidavit of Special Agent Jason S. Samuels, identified the many tools that had been used to conduct the investigation up to that point, and explained why those tools were unlikely to yield the evidence that could be obtained through a wiretap on Rodriguez's phone.  Specifically:

- **Physical Surveillance:**  Agent Samuels noted that "[a] significant amount of physical surveillance" had been undertaken, including the surveillance that had resulted in

the seizure of $25,000 from Rodriguez on December 3, 2009, and surveillance of Rodriguez on several other occasions.  As Agent Samuels explained, however, efforts to surveil Rodriguez "at and near the location of" his supposed home address – where he presumably spent a significant amount of his time – had failed.  (Samuels Aff. ¶ 35.)  Agent Samuels further observed that, based on the investigation, Rodriguez did not seem to personally handle narcotics, meaning that physical surveillance of Rodriguez would be unlikely to reveal the location of the narcotics.  (Samuels Aff. ¶ 36.)  Finally, Agent Samuels cautioned that physical surveillance is of limited value in narcotics investigations, as it "provides limited direct evidence of the significance of [any] meetings" between suspected co-conspirators.  (Samuels Aff. ¶ 37.)

- **Telephone Records:**  Agent Samuels explained that, although telephone toll and subscriber records had been obtained and used in the investigation, they were of limited use because (1) the subscriber information provided typically was false, and thus failed to reveal the true identities of the suspected co-conspirators, and (2) the records offered no evidence of the <u>substance</u> of any communications.  (Samuels Aff. ¶ 40.)

- **Prior Wire Surveillance:**  Agent Samuels properly acknowledged the importance, from a historical perspective, of the interceptions over other conspirators' telephones, but noted

7

that the prior wiretaps had not revealed the identities of the truck drivers who transported the marijuana from Florida to New York for Rodriguez and his associates, the full activities of the transportation cell, or the transportation cell's sources of narcotics.  Agent Samuels specifically noted that Rodriguez was believed to be in direct contact with these sources, and that interception of communications over his cell phone might, therefore, reveal the identities of the sources. (Samuels Aff. ¶ 41.)

- **Use of Undercover Officers:**  Agent Samuels explained that, based on his experience as a narcotics investigator, the evidence that could be obtained by introducing an undercover officer into an Organization like the one under investigation was minimal because "narcotics traffickers are usually highly reticent about discussing narcotics with unknown persons," and, in any event, an undercover officer's ability to gather meaningful evidence about an Organization of the scope and magnitude of this one was doubtful.  (Samuels Aff. ¶ 42.)

- **Use of Confidential Informants:**  Agent Samuels noted that no confidential sources had been used in the investigation, and that an incarcerated witness who had been identified as having information about Rodriguez would, of course, be useful only as a source of historical evidence and not as an active informant.  (Samuels Aff. ¶ 43.)  Agent Samuels also noted

8

that, for the same reasons as pertained to the use of undercover officers, information from a confidential informant was likely to be of limited value, given the scope of the Organization.  (Samuels Aff. ¶ 44.)

- **Federal Grand Jury:**  Agent Samuels explained that, although the Government could certainly use the grand jury to subpoena certain documents, like bank records, the grand jury was unlikely to be useful in obtaining the kind of evidence needed to prove the existence, membership, and activities of a narcotics trafficking conspiracy.  Agent Samuels noted that any witnesses whose testimony would be useful either had not yet been identified or were targets of the investigation and therefore unlikely to testify freely (or, given the covertness and the relative nascence of the investigation, to be the proper subjects of immunity orders).  Moreover, issuing grand jury subpoenas to participants in the conspiracy would simply alert the targets that they were being investigated, and thus threaten the effectiveness of any ongoing investigative activities.  (Samuels Aff. ¶ 45.)

- **Search Warrants and Seizures:**  Agent Samuels noted that agents had executed one search warrant on a "stash house," and that the search had yielded $76,672 in marijuana proceeds and approximately 22 pounds of marijuana.  Agent Samuels explained, however, that execution of further warrants at this

9

point either was not possible because further stash locations
had yet to be identified or, though possible, would alert
targets and cause them to flee and/or destroy evidence.
(Samuels Aff. ¶¶ 46-47.)

- **Arrests:**  Agents Samuels noted that arrests at this early
  stage would simply frustrate efforts to obtain more
  information about the scope, membership, and activities of the
  Organization.  As an example, Agent Samuels cited the fact
  that the detention of Jose Ramon Perez in November 2009 (by
  law enforcement authorities who were not related to this
  investigation) had apparently caused Perez and others to drop
  their phones.  (Samuels Aff. ¶ 49.)

       Having determined that the Government, through Agent
Samuels, had demonstrated probable cause that Rodriguez's cell
phone was being used to conduct narcotics activity, and that
"normal investigative procedures ha[d] been tried and ha[d]
failed or reasonably appear[ed] to be unlikely to succeed if
tried," 18 U.S.C. § 2518(3)(c), Judge Daniels authorized the
requested interception.  Interception began on January 7, 2010
and ended on January 19, 2010, after it became clear that
Rodriguez had dropped this cell phone upon suspecting
(correctly) that he was being surveilled by law enforcement.
(See Affidavit of Special Agent Jason S. Samuels in Support of
Application for Authorization to Intercept Wire Communications,

10

dated Jan. 22, 2010 ("Samuels Aff. 2") ¶¶ 32-34.)  Between
January 7 and January 11, agents intercepted several calls over
which Rodriguez was discussing narcotics transactions with his
customers.  (Samuels Aff. 2 ¶ 30.)

>    **B.    The Second Rodriguez Phone**

On January 22, 2010, after having identified another
number that Rodriguez was using to conduct his narcotics
activities, the Government, through Agent Samuels, sought
authorization to intercept communications over the new phone.
In support of this application, Agent Samuels submitted an
affidavit in which, <u>inter alia</u>, he offered many of the same
observations and explanations concerning the utility of
alternative investigative techniques that he had offered in his
January 7 affidavit, but also added that (1) physical
surveillance might be affirmatively counter-productive because,
as evidenced by Rodriguez's dropping of his first phone, he was
highly attuned to such surveillance (<u>see</u> Samuels Aff. 2 ¶ 41);
(2) some additional physical surveillance had been undertaken of
a "stash house," but the information yielded as a result was
limited (Samuels Aff. 2 ¶ 43 n.11); and (3) the incarcerated
defendant referred to in the January 7 Samuels Affidavit had
"informed other law enforcement agents that RODRIGUEZ is a
large-scale marijuana trafficker and controls several 'spots' in
New York City where marijuana is sold" (Samuels Aff. 2 ¶ 49).

On January 22, 2010, the Honorable Denny Chin, having determined that the Government had satisfied the requirements of Title III, authorized interception of communications over this second Rodriguez cell phone.  Interception commenced that day and continued until February 12, 2010, when Rodriguez dropped this phone.  (See Affidavit of Special Agent Jason S. Samuels in Support of Application for Authorization to Intercept Wire Communications, dated February 25, 2010 ("Samuels Aff. 3") ¶ 17(i).)  During the period of interception, agents heard Rodriguez discussing narcotics transactions with several co-conspirators and heard him intimating that he would use violence in connection with those who owed him drug debts.  (See Samuels Aff. 3 ¶ 36.)  During this same period of interception, Rodriguez was heard referring to a telephone number he used while in Florida, and toll records revealed the number for that Florida phone.  (Samuels Aff. 3 ¶ 37(a).)  It had now become clear that Rodriguez used different cell phones at any given time to speak with different groups of people, and that he changed his phone numbers often to avoid detection by law enforcement.  (Samuels Aff. 3 ¶¶ 39-40.)

C.   **The Remaining Narcotics Phones**

On February 25, 2010, the Government sought authorization to intercept two new telephones: the Florida phone that Rodriguez had referenced, and the new phone he was using to

12

talk to customers after dropping his previous customer phone on February 12, 2010.  In his affidavit supporting the application, Agent Samuels repeated the reasons why less invasive investigative techniques had failed and/or would be unlikely to succeed, adding references to additional investigative efforts that had taken place since the last authorization was sought. (See, e.g., Samuels Aff. 3 ¶ 45 (referencing failed efforts to surveil Rodriguez since January 11, 2010).)

The Honorable Shira A. Scheindlin authorized interception over both phones.  Interception began on February 25, 2010.  It ended on March 3, 2010 for the Florida phone and, following re-authorization by the Honorable Lewis A. Kaplan on March 27, 2010, extended until April 21, 2010 on the customer phone.

On March 3, 2010, Rodriguez ran out of funds on his Florida phone (which was prepaid), and replaced it with another. The Government, on March 22, 2010, sought authorization to intercept this replacement Florida phone.  In his affidavit supporting the application, HSI Special Agent Daniel Callaghan recited the same necessity foundation that Agent Samuels had previously provided, adding references to recent, marginally successful uses of traditional investigative techniques to further the investigation.  (See Affidavit of Special Agent Daniel Callaghan in Support of Application for Authorization to

13

Intercept Wire Communications, dated March 22, 2010 ("Callaghan Aff.") ¶ 47 (citing surveillance of Rodriguez in March 2010).) The Honorable Lewis A. Kaplan authorized the requested interception, and the interception continued through to April 21, 2010.

Meanwhile, the investigation – principally, the wire intercepts – had revealed that Rodriguez was using a telephone entirely separate from the ones that had been intercepted to date to communicate almost exclusively with his brother, co-conspirator, and primary worker, Jose Rodriguez, a/k/a "Viejo" ("Viejo"). Accordingly, offering substantially the same necessity foundation that he had laid in prior affidavits, but supplementing it with new information gained during the investigation, Agent Samuels swore an affidavit supporting the Government's interception of this Viejo-communication phone. (Affidavit of Special Agent Jason S. Samuels in Support of Application to Intercept Wire Communications, dated April 5, 2010 ("Samuels Aff. 4"); see, e.g., Samuels Aff. 4 ¶ 61(b) (noting that Rodriguez's use of multiple telephones at a given time meant prior wire surveillance necessarily did not capture full scope of Organization's membership or activities).) At the same time, the Government sought authorization to intercept communications over Viejo's own phone. (See generally Samuels Aff. 4.) On April 5, 2010, the Honorable John G. Koeltl

authorized the requested interceptions.  Interception over the Viejo-communication phone commenced April 5, 2010 and ended May 5, 2010, and interception over Viejo's own phone commenced April 5, 2010 and extended to May 25, 2010.

On April 28, 2010, the Government sought authorization to intercept communications over the new phone that Rodriguez, having discarded his prior customer phone, was now using to talk to his New York area customers.  Again, the same necessity foundation was laid, with updates.  (See, e.g., Affidavit of Special Agent Jason S. Samuels in Support of Application to Intercept Wire Communications, dated April 28, 2010 ¶ 49 (noting additional efforts to conduct physical surveillance).)  The Honorable Lawrence M. McKenna authorized the interception, which continued, with interim re-authorizations by the Honorable Richard J. Holwell and the Honorable Sidney H. Stein, through until July 19, 2010.

While that interception was underway, Judge McKenna, having reviewed substantially the same necessity foundation as was offered in support of all prior intercepts over Rodriguez's phones (see Affidavit of Special Agent Thomas Acocella in Support of Application for Authorization to Intercept Wire Communications, dated May 6, 2010, ¶¶ 51-66), authorized on May 6, 2010 the interception of communications over a new phone Rodriguez was using to talk to his contacts in Florida.  That

15

interception continued through to May 24, 2010, when Rodriguez
dropped the phone.  Similarly, and again based on substantially
the same necessity foundation,[2] (1) the Honorable William H.
Pauley III and the Honorable P. Kevin Castel authorized
interceptions of communications over a new telephone that Viejo
was using through until August 5, 2010, and (2) this Court,
Judge Sullivan, and Chief Judge Preska all authorized
interceptions (or continued interceptions) of communications
over serial replacement phones Rodriguez was using to
communicate with customers through until October 14, 2010.

> D.    **The Rodriguez Money Phone**

While the Government was intercepting communications
over the phones Rodriguez and Viejo were using to arrange and
conduct narcotics transactions, agents learned that Rodriguez
and Espinal - against whom the Government had, in an unrelated
case, developed significant evidence of bribery - were co-

---

[2] See Affidavit of Special Agent Ismael Quintana in Support of
Application for Authorization to Intercept Wire Communications,
dated June 14, 2010, ¶¶ 53-68; Affidavit of Special Agent Ismael
Quintana in Support of Application for Authorization to
Intercept Wire Communications, dated July 13, 2010, ¶¶ 53-70;
Affidavit of Special Agent Ismael Quintana in Support of
Application for Authorization to Intercept Wire Communications,
dated August 5, 2010, ¶¶ 53-71 (laying same necessity foundation
as before, but detailing surveillance and seizures that had been
effected due in large part to prior wire interception);
Affidavit of Special Agent Jason S. Samuels in Support of
Application for Authorization to Intercept Wire Communications,
dated Sept. 3, 2010, ¶¶ 51-69 (same); Affidavit of Special Agent
Thomas Acocella in Support of Authorization to Intercept Wire
Communications, dated Sept. 24, 2010, ¶¶ 48-66 (same).

signatories on a bank account held in the name of

"FlyFishermanseaven [sic] LLC." (Affidavit of Special Agent

Jason S. Samuels in Support of Application to Intercept Wire

Communications, dated July 19, 2010 ("Samuels Aff. 5"), ¶¶ 54,

56-59.) Agents further learned that Rodriguez and Espinal had

been engaged in certain real estate transactions together in the

midst of Rodriguez's narcotics trafficking activities (see

Samuels Aff. 5 ¶ 55), and observed that Rodriguez was talking to

Espinal over a new phone – a "money" phone – in circumstances

and at times that supported a hypothesis that Espinal was

helping Rodriguez launder proceeds of narcotics trafficking.

(See Samuels Aff. 5 ¶ 62.)

        Based on this new information, the Government, on July

19, 2010, sought authorization to intercept communications over

Rodriguez's money phone. In support of the application, Agent

Samuels offered much of the same necessity foundation he had

offered in support of prior wire applications in this

investigation, but also noted that (1) it appeared Espinal had

not previously been intercepted over any of Rodriguez's phones,

and that Rodriguez was compartmentalizing his money laundering

communications over a cell phone different than ones previously

identified; (2) cooperating witnesses who might have information

concerning money laundering and/or bribery were useful only for

historical purposes; and (3) grand jury subpoenas were of

17

limited use in part because the records they yielded would not reveal proof of criminal intent.  (Samuels Aff. 5 ¶¶ 76, 79-80, 83.)

Judge Daniels authorized the interception of communications over Rodriguez's money phone, and Judge Sullivan, having been presented with substantially the same necessity foundation as had been supplied in support of the initial application (see Affidavit of Special Agent Jason S. Samuels in Support of Application for Authorization to Intercept Wire Communications, dated Aug. 19, 2010 ("Samuels Aff. 6") ¶¶ 71-95), reauthorized the interception.  Interception continued until September 20, 2010.

### E.    The Espinal Phone

Interceptions over Rodriguez's money phone proved fruitful, yielding evidence that Espinal and Rodriguez had conspired together to launder substantial narcotics proceeds through investments in real estate – including a parcel of land in Sullivan County, New York that had been purchased by Rodriguez's and Espinal's jointly-owned entity, FlyFisherman's Heaven LLC.  (See Samuels Aff. 6 ¶ 68; Affidavit of Special Agent Jason S. Samuels in Support of Application for Authorization to Intercept Wire Communications, dated Sept. 23, 2010 ("Samuels Aff. 7") ¶ 44.)  Based on these interceptions and other evidence, the Government sought authorization to intercept

18

communications over Espinal's own phone.  In explaining why investigative techniques other than wire interception over Espinal's phone would be unlikely to yield (or, in some cases, had been tried but had not yielded) the evidence that could be obtained by wiretap, Agent Samuels offered the following observations:

- **Undercover Agents and Confidential Informants:**  Agent Samuels explained that agents had not established contact with Rodriguez or Espinal, and saw no possibility of successfully introducing an informant or an undercover to either of them, given the unlikelihood that either would discuss his money laundering activities with non-participants.  Agent Samuels noted that a cooperating defendant and informants had provided historical information regarding Rodriguez, but observed, as he had in other affidavits, that these sources of information could supply only historical data and not any active assistance.  (Samuels Aff. 7 ¶ 48(a).)

- **Visual Surveillance:**  Agents Samuels detailed the surveillance that had been done on Rodriguez and on Espinal, as well as on certain properties implicated in their suspected money laundering scheme, but explained that physical surveillance was of very limited utility in "money laundering investigations like this one that involve real estate transactions and investigations of political corruption, where

investigators are unlikely to be able to witness corrupt transactions occurring in public places." (Samuels Aff. 7 ¶ 48(b).)

- **Telephone Toll Records:** As he had in prior affidavits, Agent Samuels explained that telephone toll records were of limited utility because they revealed only the _fact_ of contact between co-conspirators and not the content or nature of the communications. (Samuels Aff. 7 ¶ 48(c).)

- **Federal Grand Jury and Witness Interviews:** Agent Samuels explained that any witnesses with useful information would themselves have criminal exposure, and therefore would be unlikely to give non-immunized testimony before the grand jury. (Samuels Aff. 7 ¶ 48(d).) He further noted that grants of immunity to such witnesses would be premature. (_Id._) Finally, Agent Samuels observed that, although document subpoenas had been used to collect valuable evidence, they were "insufficient to fully determine the methods and means used" by the co-conspirators or their mutual "understandings." (_Id._; Samuels Aff. 7 ¶ 48(e).)

- **Search Warrants and Arrests:** Agents Samuels noted that execution of search warrants at any of the locations agents had identified with Rodriguez's and Espinal's joint criminality would be premature, both because there was (at that time) insufficient indication that incriminating

20

materials were located at any of those properties, and because any such searches would result in an unwarranted end to what had been a covert operation.  (Samuels Aff. 7 ¶ 48(f).)  Agent Samuels offered the latter reason as the principal basis for agents' decision not to arrest suspected conspirators as well. (Samuels Aff. 7 ¶ 48(g).)

- **Prior Intercepts:**  Agent Samuels explained that the interceptions to date had focused principally on Rodriguez's and others' narcotics activities, and that even the interception over Rodriguez's money phone had, not surprisingly, failed to reveal Espinal's contacts with an individual he was suspected of having bribed or Espinal's contacts with co-conspirators who were helping him launder Rodriguez's narcotics proceeds.  (Samuels Aff. 7 ¶ 48(h).)

Having determined that the Government, through Agent Samuels, had established that "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried," 18 U.S.C. § 2518(3)(c), Chief Judge Preska authorized interception of communications over Espinal's phone on September 23, 2010.  Interception began on or about that date and terminated on or about October 23, 2010.

## III. THE CHARGES

Count One of the S12 Indictment, which was filed on November 9, 2010, charges Rodriguez and dozens of other

21

defendants with conspiracy to distribute and to possess with intent to distribute, in violation of Title 21, United States Code, Section 846, 1,000 kilograms and more of marijuana over nearly two decades, from in or about 1992 to in or about October 2010.  Among the 55 overt acts alleged to have been undertaken by the charged defendants and their co-conspirators in furtherance of the conspiracy are the transportation of hundreds of thousands of dollars of narcotics proceeds, the transportation of hundreds of pounds of marijuana, and the use of cell phones to arrange narcotics transactions and to discuss "grow houses" where marijuana plants were cultivated and "stash houses" containing marijuana, marijuana proceeds, and other narcotics-related paraphernalia.

The only other count of the S12 Indictment in which Rodriguez is charged is Count Two, which, like Count One, alleges that Rodriguez and others participated from in or about 1992 through in or about October 2010 in a conspiracy to distribute and to possess with intent to distribute 1,000 kilograms and more of marijuana, in violation of 21 U.S.C. § 846.  Count Two differs from Count One because it charges a narrower universe of defendants – specifically, those involved in the "Rodriguez Cell" of the greater Organization defined in Count One.

Finally, as relevant here, Rodriguez and Espinal are

22

charged together in the S20 Indictment, filed February 7, 2012, which contains three counts.  Count One charges Rodriguez and Espinal with conspiracy to commit money laundering and to engage in unlawful financial transactions, in violation of Title 18, United States Code, Section 1956(h).  Count Two charges Espinal with obstruction of justice, in violation of Title 18, United States Code, Section 1512(c) and 2.  And Count Three charges Espinal with unlawful possession of a firearm following conviction of a felony, in violation of Title 18, United States Code, Section 922(g)(1).

## IV.   THE MOTIONS

On December 21, 2011, before the filing of the S20 Indictment, Rodriguez filed one motion in which he sought (1) suppression of all wiretap evidence obtained from surveillance of his own cell phones, based on the Government's alleged failure to have established necessity; (2) dismissal of Count Two of the S12 Indictment on grounds that it is (a) insufficiently pleaded and (b) multiplicitous; (3) certain pretrial disclosures from the Government; and (4) leave to join any relevant motions filed by co-defendants.[3]  Rodriguez also

---

[3] The Government is unaware of any such motions that would be applicable to Rodriguez.  Several defendants filed motions requesting to join Rodriguez's motion to suppress evidence obtained through the wiretaps on Rodriguez's phones.  Of those defendants, only Daniel Fernandez and Daniel Valdez have not entered guilty pleas as of the filing of this response.  (Def.

filed a second motion, the same day, in which he requested unspecified relief, to include a hearing, relating to a Deputy U.S. Marshal who had been his neighbor and whom he had seen in the courthouse following his arrest.

On March 16, 2012, following the filing of the S20 Indictment, Espinal filed a motion seeking (1) to suppress evidence obtained through the wiretap of his phone and Rodriguez's money phone, on the ground that the Government had failed to establish necessity, and (2) severance of Count Three of the S20 Indictment from Counts One and Two thereof. Rodriguez filed no new motions in response to the S20 Indictment, but reiterated his request to join in any motions made by co-defendants – here, Espinal.

**ARGUMENT**

I.   **THE COURT SHOULD DENY THE DEFENDANTS' MOTIONS TO SUPPRESS THE WIRETAP EVIDENCE FOR FAILURE TO ADEQUATELY DEMONSTRATE NECESSITY**

A.   **Applicable Law**

Title 18, United States Code, Section 2518 dictates the procedures for authorizing the interception of electronic communications.  Among other requirements, Section 2518(1)(c) requires that an application for the interception of oral

---

Daniel Fernandez's Request to Adopt Arguments of His Co-Defendants, filed Jan. 3, 2012, at 1; Def. Daniel Valdez's Mem. of Law in Support of Pretrial Mots., filed Jan. 11, 2012, at 12.)

communications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Similarly, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

A court must take a "commonsense approach" to this requirement. United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009). Thus, although "generalized and conclusory statements that other investigative procedures would prove unsuccessful" do not suffice, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." Id. (internal quotation marks omitted). "'[T]he statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.'" Id. (quoting United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999)). In large, sprawling conspiracy investigations, the limitations of traditional investigative techniques are likely to be felt

25

especially acutely, and the necessity for the use of wiretaps to develop evidence is, correspondingly, more readily established than it is in more discrete investigations.  See United States v. Concepcion, 579 F.3d at 318, 319 (noting that "large criminal drug conspirac[ies] . . . often require[] the aid of a wiretap"); United States v. Torres, 901 F.2d 205, 232 (2d Cir. 1990).[4]

Defendants who were named targets of the wiretap that was authorized, or whose communications were intercepted, have standing to challenge the order authorizing the wiretap.  See United States v. Bianco, 998 F.2d 1112, 1122 (2d Cir. 1993); United States v. Fury, 554 F.2d 522, 525 (2d Cir. 1977).  The standard applicable to such a challenge, however, is a stringent one:  Once the authorizing judge has made the requisite probable cause and necessity determinations, any court reviewing those determinations must grant "considerable deference" to the authorizing judge.  Concepcion, 579 F.3d at 217 & n.1; accord United States v. Yannotti, 541 F.3d 112, 124 (2d Cir. 2008); United States v. Diaz, 176 F.3d at 110.  The reviewing court's role is to "decide if the facts set forth in the application

---

[4] Especially in light of this judicial recognition of the usefulness of – and need for – wiretap evidence in large narcotics conspiracy investigations, Rodriguez's unsourced assertion that "[m]ost drug investigations – even large ones – do not involve the use of electronic surveillance" (Rodriguez Mem. at 15), would, even if true, be of no moment.

were minimally adequate to support the determination that was made." Concepcion, 579 F.3d at 217; United States v. Yannotti, 541 F.3d at 124; see also United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997).

**B.   Discussion**

Applying these standards, Rodriguez's and Espinal's challenges to the wiretap authorizations in this case must fail.

*i.   The Rodriguez Narcotics Phone Wiretaps*

In all of the affidavits submitted in support of the wiretap authorizations for Rodriguez's (and his brother Viejo's) narcotics phones, the testifying agents thoughtfully and fully explained why wiretaps were needed to investigate, among other things, the location of "stash houses" and "grow houses," the identities of co-conspirators in the New York area and suppliers and contacts in Florida, and the identities of members of the transportation system that conveyed multi-kilogram loads of marijuana from Florida to New York.  The affidavits detailed the investigative techniques that had been employed to date, including repeated and continuing physical surveillance (the most recent results of which were reported to each authorizing judge), seizures of marijuana and narcotics proceeds, prior wire surveillance, and telephone toll records.

For each such technique, the affidavits spelled out the limitations inherent therein:  Physical surveillance could

27

help establish the identities of targets' associates and their
meeting places, but tended not to reveal the location(s) of
drugs or proceeds or the nature of the surveilled persons'
meetings.  The likelihood that physical surveillance would be
useful in gathering substantial evidence against Rodriguez
himself, moreover, was especially low because of Rodriguez's
demonstrated sensitivity to law enforcement presence.  Telephone
toll records were useful in establishing contact between targets
and their co-conspirators, but could shed little light on the
content of the communications or the true identities of the
conspirators, given that many of the phones (including all of
Rodriguez's intercepted phones) were registered in names other
than those of their true owners.  Prior wire surveillance was
useful as far as it went, but could not yield the evidence that
would be obtained from intercepting communications over a new
phone Rodriguez was using to engage in new narcotics
transactions.  Rodriguez's careful compartmentalization of his
phones – New York area-based customers, Viejo, Florida-based
suppliers and transporters, and money – provided an additional
reason to intercept communications over each type of phone.

Finally, the affidavits all offered reasonable
explanations for why techniques not yet employed to any
significant degree – use of confidential informants and
undercover officers, grand jury subpoenas, and arrests of

28

targets – either were not feasible or were likely to be counter-productive.  Specifically, Agent Samuels and others explained that they had not identified any confidential informants who could actively gather evidence, and reasonably believed that undercover agents would be unlikely to prove successful in infiltrating this sprawling Organization at a sufficiently high level to yield meaningful results.  See United States v. Jimenez, No. 10 Cr. 316 (VM), 2011 WL 308401, at *2 (S.D.N.Y. Jan. 28, 2011) (approving this reasoning with respect to undercover agents).  Grand jury subpoenas and arrests, for their part, would simply alert the targets of the investigation and thus thwart the gathering of further evidence.

Faced with these explanations of the limitations of traditional investigative techniques in this case, and of the corresponding need for wiretap evidence, Rodriguez resorts principally to (1) identifying purported contradictions in the affidavits that are not, in fact, contradictions; (2) accusing Agent Samuels of misstating facts and misleading authorizing judges; and (3) holding the agent affidavits to a standard that the Second Circuit has explicitly rejected.

First, Rodriguez seizes upon what he views as a contradiction between Agent Samuels' statements that the investigation in this case began "in or about February 2009" and that surveillance of Rodriguez began in December 2009.

29

(Rodriguez Mem. at 5, 26-27 (citing Samuels Aff. ¶¶ 18, 35).)
In similar fashion, Rodriguez professes to misunderstand how
agents could know in January 2010 that Rodriguez was a
participant on a November 24, 2009 call, when they did not begin
surveilling him until December 2009.  (Id. at 27.)  There is no
contradiction or confusion.  As is clear from the affidavits,
the investigation – including through use of wiretaps obtained
from the SNC – began long before agents first surveilled
Rodriguez meeting with Kenneth Pena on December 3, 2009, and
before agents identified Rodriguez as a target.  Once he was so
identified, agents were able to return to the wiretap recordings
they had obtained through the interception of Pena's phone in
November 2009 and identify which calls had been with Rodriguez.[5]

        Second, Rodriguez questions why agents did not make
more use of a "known or other confidential informant," and,
relatedly, accuses Agent Samuels and other agents of misleading
the authorizing judges by asserting that no confidential
informants were available when, in fact, an incarcerated
defendant was available as a source of historical information (a
fact which, as explained above, was explicitly revealed in the

---

[5] The only other alleged contradiction that Rodriguez is able to
identify consists of two inconsistent statements about the date
on which the wiretap over this other target's phone was
terminated.  (See id.)  Rodriguez does not claim, nor could he,
that this inconsistency was remotely material to the issues of
probable cause or necessity.

affidavits).  (Rodriguez Mem. at 16; id. at 25, 28.)  The objection is baffling.  It should go without saying that an incarcerated defendant is a poor candidate for active confidential informant status.  Such a person cannot engage with targets in ongoing criminal activity, and is, of course, poorly placed even to supply current intelligence about the activities of the targets.[6]

Third, Rodriguez asserts that the Government failed to establish the inadequacy of alternative investigative techniques because it focused on each technique individually, and "[n]ecessity is not gauged against the likely efficacy of any single technique." (Rodriguez Mem. at 18-20.)  Again, the objection is puzzling.  To be sure, the Government, through Agent Samuels and others, detailed the limitations of each alternative technique in the context of this investigation.  In

---

[6] Rodriguez goes on to accuse Agent Samuels of "being coy with the court" and "not being forthright with the court" by refraining from detailing the evidence that the identified incarcerated defendant supplied to agents.  (Rodriguez Mem. at 18.)  But there was no need to detail that historical evidence because the point Agent Samuels was making was simply that an incarcerated defendant does not a good active CI make.  Rodriguez seems at times to be trying to bootstrap himself into the Franks hearing he requests – and, perhaps, an accompanying preview of a cooperating defendant's testimony – by casting aspersions on the character and ethics of a federal agent.  The Court should reject this effort.  After all, a Franks hearing is warranted only where the movant "establishes intentional or reckless omissions or false statements that are 'necessary to the finding of probable cause.'"  United States v. Miller, 116 F.3d 641, 664 (2d Cir. 1997) (quoting Franks v. Delaware, 438 U.S. 154, 156 (1978)).  No such showing has been made here.

so doing, the Government explained what gaps were left in the investigation – and that those gaps could, realistically, be filled only by the requested wiretaps.  Only by walking through each technique and its concomitant limitations or risks could these gaps be revealed.

Fourth, Rodriguez second-guesses Agent Samuels' (and the serial authorizing judges') assessment that arrests of targets, execution of search warrants, and other seizures would thwart rather than advance the investigation because they would alert targets to the investigation.  (Rodriguez Mem. at 19-21.) Particularly given that Rodriguez dropped a phone in the course of the investigation when he saw law enforcement officers surveilling him, thus preventing interception of communications pursuant to an authorized wiretap, the risks Agent Samuels identified cannot seriously be doubted.

Fifth, Rodriguez levels the curiously semantic argument that because one can never truly know the "full" extent of another's activities, Agent Samuels' explanation that use of an undercover officer, telephone toll records, and search warrants would not reveal the "full scope" of the Organization's membership and activities was somehow deficient.  (Rodriguez Mem. at 22, 25-26.)  The criticism obscures the point Agent Samuels was making: that an undercover introduced at this stage, when the Organization is so obviously sprawling and well-

32

developed, would be able to glean, at best, only a snapshot of
the Organization's activities and membership, and, likewise,
that telephone toll records and search warrants could yield only
limited information.  This is a valid basis for determining that
a particular investigative technique is inadequate.  See, e.g.,
United States v. Fazio, No. 11 Cr. 873 (KBF), 2012 WL 1195157,
at *4, 11 (S.D.N.Y. April 6, 2012) (upholding authorizing
court's determination of necessity where agent indicated
limitations of other techniques in revealing "full scope of
illegal activities"; stating that "[t]here can be no serious
dispute that given the particular nature of this investigation,
in which the content of communications is critical and
secretive, that toll, pen register analyses, and physical
surveillance here could not reach far enough"); United States v.
Bernardino, No. 07 Cr. 151 (PKC), 2007 WL 4462176, at *1-2
(S.D.N.Y. Dec. 17, 2007) (affirming authorizing court's
determination of necessity where agent explained other
techniques "would not reveal the full scope of the organization
and its activities," or "the full extent of the organization's
methods and membership"); United States v. Gigante, 979 F. Supp.
959, 963 (S.D.N.Y. 1997) (where certain techniques would reveal
only "discrete aspects" of organization's criminal activities,
necessity was shown).

        Sixth, and finally, Rodriguez claims that the

33

Government's necessity foundation was lacking because agents could have conducted further physical surveillance by, for example, following truck drivers who had been observed carrying loads of marijuana and proceeds. (Rodriguez Mem. at 23-24.) But of course that <u>was</u> done, as detailed at in the evolving agents' affidavits as the investigation proceeded.[7] To the extent Rodriguez criticizes the lengths to which the investigating agents went in conducting this physical surveillance, and the effort expended, the criticism amounts to the sort of "'Monday morning quarterbacking'" that courts routinely reject. <u>See</u> <u>United States</u> v. <u>Bernardino</u>, 2007 WL 4462176, at *2 (quoting Judge Weinfield's decision in <u>United States</u> v. <u>Shipp</u>, 578 F. Supp. 980, 989 (S.D.N.Y. 1984), <u>aff'd</u>, <u>United States</u> v. <u>Wilkinson</u>, 754 F.2d 1427 (2d Cir. 1985));

---

[7] Rodriguez accuses Agent Samuels of "withhold[ing] from the judicial officer certain information in order to provide greater resonance for his necessity argument," in part because he allegedly did not specify until September 2010 the identity of the truck driver who was seen in August 2009 with 87 pounds of marijuana and stopped again on April 26, 2010. (Rodriguez Mem. at 24 & n.9.) The accusation is unfounded. The driver's identity was revealed for the first time in an affidavit submitted in May 2010, not September 2010 (see Affidavit of Jason S. Samuels in Support of Application for Authorization to Intercept Wire Communications, dated May 27, 2010, ¶¶ 3, 49), and Rodriguez fails to explain how the name of a single driver, whose activities had already been noted in all relevant affidavits, would have altered the determination whether to authorize the requested wiretaps, or, relatedly, why Agent Samuels would have any incentive to withhold the driver's name. There is no dispute that many individuals involved in the transportation cell of the Organization had yet to be identified.

United States v. Gigante, 979 F. Supp. at 963 ("[S]o long as
fundamental constitutional rights are preserved, the issuing
court's determination should not be subjected to gratuitous
'Monday morning quarterbacking'.").  After all, as discussed
above, "[t]hat a wiretap applicant must disclose other
investigative techniques already used or that might be
successfully used does not mean that any particular
investigative procedures or all other possible means of
investigation must be exhausted before a wiretap may be
authorized."  United States v. Lombardo, No. 98 Cr. 1180 (DLC),
1999 WL 305096, at *5-6 (S.D.N.Y. May 14, 1999) (noting, in
rejecting necessity challenge to wiretap authorization, agent's
recitation that physical surveillance "had not led to the
identification of all those observed with the targets of the
investigation nor the subject matter of their meetings").

  In short, none of the criticisms Rodriguez levels at
the agent affidavits supporting the various wiretap applications
for the Rodriguez narcotics phones has merit.  The Court should
deny Rodriguez's motions with respect to these wiretaps without
a hearing.

  *ii.  The Rodriguez Money Phone and the Espinal Phone*

  Espinal's challenge to the Rodriguez money phone and
Espinal phone wiretap authorizations is equally meritless.  As
with the narcotics phone affidavits, the agent affidavits

relating to these two phones supplied ample, thoughtful assessments of the limitations of the alternative investigative techniques that had been tried to date, and the unlikelihood that certain other techniques would succeed in securing the evidence sought to be secured through the requested wiretaps.

Concerning the Rodriguez money phone, Agent Samuels offered many of the same explanations of the limitations of various alternative techniques as he had offered in support of the Rodriguez narcotics phone applications.  He also added that agents had not identified any confidential informants who could be used in an active capacity to investigate the suspected money laundering or bribery, and that documents could tell only part of the story in cases, such as this, where a target's intent and knowledge were at issue.  (Samuels Aff. 5 ¶¶ 76, 79-80, 83.)

In support of the application seeking authorization to intercept communications over Espinal's phone, Agent Samuels offered similar explanations of the limited utility (and, in some cases, counter-productiveness) of alternative investigative techniques in a case, like this one, that involved a covert investigation of a number of different transactions and properties, in circumstances where the participants had every incentive to hide their activities from view and from outsiders, and where proof of intent would be established most effectively through the participants' own statements to one another.

(Samuels Aff. 7 ¶ 48.)

Espinal's challenges to Judge Daniels' and Judge Sullivan's orders authorizing interception of the Rodriguez money phone and Chief Judge Preska's order authorizing interception of the Espinal phone echo in many respects those asserted by Rodriguez in support of suppressing the orders for the narcotics phones, and should be rejected for reasons similar to those set forth above.

First, Espinal argues that Agent Samuels' explanation for agents' inability to use confidential informants or undercover agents to obtain the evidence sought was defective because it did not explicitly reference bribery. (Mem. of Law in Support of Def. Jose Espinal's Mot. to Suppress Statements and Sever Counts One and Two from Count Three, filed March 16, 2012 ("Espinal Mem."), at 6.) But specifying the need for the wiretap to secure evidence of money laundering alone would have been sufficient – if a wiretap is validly sought and used to obtain evidence of one crime, evidence incidentally obtained of another crime is perfectly admissible. See, e.g., Concepcion, 579 F.3d at 217-18 (reversing district court's suppression of wiretap evidence in case where application sought to find evidence of terrorism and wiretap in fact yielded evidence of narcotics activity and other crimes). In any event, the explanations Agent Samuels offered manifestly were applicable to

the investigation of both money laundering and bribery:  There
was no basis for agents to believe that use of confidential
informants or undercovers would effectively penetrate the
suspected conspiracy to commit these crimes, and Espinal does
not offer one.

Second, Espinal, like Rodriguez, argues that Agent
Samuels failed to demonstrate that confidential informants were
unavailable because he acknowledged the Government's prior use
of "informants" and a "charged defendant" who had historical
information about Rodriguez.  (Espinal Mem. at 7-8.)  To
reiterate: an incarcerated defendant or other informant with
only historical information to offer is not the same thing as a
confidential informant who can secure evidence of ongoing
crimes.  If agents are able to use active confidential
informants, the need for a wiretap may be less pressing, because
the active informants potentially offer an alternative means of
catching the targets in action.  But the same cannot be said of
historical "informants" and incarcerated defendants.

Third, Espinal faults Agent Samuels for failing to
specify in his affidavits "[e]xactly how much effort . . . the
Government expend[ed]" in conducting physical surveillance.
(Espinal Mem. at 8.)  The objection is baseless; Agent Samuels
outlined for the authorizing judge the surveillance that had
been undertaken, and that was sufficient.  Espinal offers no

38

authority to the contrary.

Fourth, and in the same vein, Espinal criticizes Agent Samuels' failure to fully detail exactly what documents and records had been obtained through grand jury subpoena, and what gaps remained in those documents. (Espinal Mem. at 9.) This misses the point. As Agent Samuels explained, documents reveal only so much in a money laundering and bribery investigation, where key issues include the intent and "understandings" of the co-conspirators. (Samuels Aff. 8 ¶ 48(d).) In any event, there is no basis for the suggestion that agents had to have issued every conceivable document subpoena – and pored over every single return to every such subpoena – before determining that documents could not tell the whole story. Agents are permitted to rely on common sense and their experience.

Finally, Espinal attacks Agent Samuels' proffered reason for wanting to avoid execution of too many search warrants by (1) second-guessing Agent Samuels' (and Chief Judge Preska's) judgment that alerting targets to the investigation through these activities would thwart the investigation and (2) asserting that the targets already knew about the investigation. (Espinal Mem. at 10-11.) The first point is, at best, naïve; the criminal conduct by Rodriguez and Espinal was believed at the time to be, and would in fact later would prove to have been, ongoing at the time the wiretap over Espinal's phone was

sought.  Obviously, alerting the targets to the investigation
would have thwarted the collection of evidence concerning this
ongoing scheme.  And, even if, as Espinal posits, he and
Rodriguez were already aware of some law enforcement interest at
this point, Agent Samuels had no reason to believe they knew,
for example, of an investigation into their joint money
laundering scheme.

Again, the reasons offered here for suppression of the
wiretap evidence lack merit.  The wiretap authorizations for the
Rodriguez money phone and the Espinal phone should be affirmed,
and the defendants' motions denied without a hearing.

## II.  THE COURT SHOULD DENY RODRIGUEZ'S MOTION TO DISMISS COUNT TWO

Rodriguez's motion to dismiss Count Two for
insufficient pleading and multiplicity lacks legal support and
must be rejected.

### A.  The Government is Permitted to Proceed on Multiplicitous Counts Until Sentencing

Rodriguez's motion to dismiss on multiplicity grounds
should be denied as premature.  The Government does not dispute
that Counts One and Two are multiplicitous.  Count One charges
Rodriguez and others with a conspiracy to distribute and possess
with intent to distribute 1,000 kilograms and more of marijuana
from 1992 until October 2010, and Count Two charges a smaller
subset of individuals, including Rodriguez, with the same

40

conduct.  In this respect, Count Two is akin to a lesser-included charge of Count One.  At this stage of the case, and until Rodriguez has been convicted of both Counts, the Government may continue to pursue both charges, and neither should be dismissed.[8]

The reason is that, "[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006). "Even where the Double Jeopardy Clause would bar cumulative punishment for more than one such offense, 'the Clause does not prohibit the State from prosecuting [the defendant] for such multiple offenses in a single prosecution.'"  Id. (quoting Ohio v. Johnson, 467 U.S. 493, 500 (1984)).

Of course, after conviction of multiplicitous charges, a defendant can raise a Double Jeopardy challenge and insist upon being sentenced only with respect to a single such charge. But no such convictions have been entered, and so the motion to dismiss must be denied.  See, e.g., United States v. Gupta, No. 11 Cr. 907 (JSR), 2012 WL 1066804, at *2 (S.D.N.Y. Mar. 27,

---

[8] The Government has good reason for proceeding in this fashion. As drafted, the S12 Indictment assists the jury in understanding how the charged conspiracy operated – that is, that there was one overarching conspiracy and several "cells" – including the Rodriguez Cell - within that conspiracy.

2012) (refusing to adjudicate pre-trial Double Jeopardy claim arising from allegedly multiplicitous counts); United States v. Treacy, No. 08 Cr. 0366 (RJC), 2009 WL 47496, at *2 (S.D.N.Y. Jan. 8, 2009) (same).

### B.    Count Two is Sufficiently Pleaded

The motion to dismiss for insufficient pleading should be denied as well – for at least two reasons.

First, even viewed in isolation, Count Two, which alleges a conspiracy in violation of 18 U.S.C. § 846, is sufficiently pleaded.  An indictment need "'do little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" United States v. Walsh, 194 F.3d 37, 45 (2d Cir. 1999) (quoting United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir, 1975)). Count Two omits no pertinent part of the statutory language, and identifies a number of co-conspirators.  The count does not allege any overt acts, but no such allegations are required. See United States v. Shabani, 513 U.S. 10, 17 (1994).  Not surprisingly, Rodriguez can cite not a single case in which a narcotics conspiracy charge akin to Count Two was has been dismissed for insufficient pleading.[9]

Second, when viewed as a whole, the S12 Indictment

---

[9] Notably, Rodriguez has at no point moved for a bill of particulars with respect to Count Two.  Cf. Fed. R. Crim. P. 7(f).

gives Rodriguez an unusually detailed account of the factual predicate for Count Two.  As explained above, and as is evident from the face of the S12 Indictment, Count Two simply charges a narrower subset of individuals with the same conspiracy, spanning the same period of time, as Count One.  Rodriguez raises no sufficiency challenge to Count One; there are, after all, 55 overt acts pleaded in support of that charge.  A review of those 55 acts reveals that most of them – 37 - allege acts undertaken by the subset of conspirators who are charged in Count Two, the Rodriguez Cell.  And many of those allege acts undertaken by Rodriguez himself.  Viewing the indictment as a whole, as the Court must, see United States v. Walsh, 194 F.3d 37, 45 (2d Cir. 1999); United States v. Castellaneta, No. 06 Cr. 684 (GEL), 2006 WL 3392761, at *1 (S.D.N.Y. Nov. 20, 2006), there can be no question that Rodriguez is well-advised of the charges against him.

**III. THE COURT SHOULD DENY RODRIGUEZ'S MOTION FOR UNSPECIFIED RELIEF, TO INCLUDE A HEARING, ON HIS SUSPICION CONCERNING A DEPUTY U.S. MARSHAL**

Rodriguez, through a stand-alone motion, has requested unspecified relief, including a hearing, based on his suspicion that a Deputy U.S. Marshal whom he has encountered in the courthouse entered into his apartment illegally during the course of this investigation.  The facts that Rodriguez alleges in his affidavit give no basis for a hearing or any other

relief.  Rodriguez alleges that the Deputy U.S. Marshal whom he identifies lived next door to him during the pendency of this investigation; that Rodriguez saw evidence that his apartment locks had been tampered with; and that, following Rodriguez's arrest, the Deputy U.S. Marshal assured Rodriguez he had nothing to do with this case.  (<u>See</u> Affidavit of Manuel Geovanny Rodriguez-Perez, filed Dec. 14, 2011.)  There is no reason, even assuming the truth of all facts asserted, to believe that the Deputy U.S. Marshal to whom Rodriguez refers was responsible for any tampering.  To the contrary, Rodriguez's affidavit, reciting as it does the denials of that fact by the Deputy U.S. Marshal, support no other inference than that the Deputy U.S. Marshal was <u>not</u> involved in any tampering.

## IV. THE GOVERNMENT AGREES THAT COUNT THREE SHOULD BE SEVERED FROM COUNTS ONE AND TWO OF THE S20 INDICTMENT

Espinal requests that the Court conduct separate trials of Counts One and Two of the S20 Indictment, on the one hand, and Count Three of that Indictment, on the other.  The Government joins in this request.

## V. THE GOVERNMENT AGREES TO SUPPLY NOTICE PURSUANT TO RULES 404(B), 609(B), AND 807(B), EXPERT NOTICE, AND A TENTATIVE EXHIBIT LIST WITH ANY RELEVANT TRANSLATIONS OF RECORDINGS SIX WEEKS IN ADVANCE OF TRIAL

Rodriguez requests that the Court issue an order directing the Government to (1) give notice six weeks prior to trial of any "other acts" evidence it intends to present

pursuant to Federal Rule of Evidence 404(b), and of any expert witness it intends to call at trial, and (2) identify six weeks before trial all documents it intends to use at trial as well as all recordings and accompanying transcripts it intends to offer. (Rodriguez Mem. at 40.)  Defendant Oscar Rodriguez makes a similar request, but would have the Court direct even earlier disclosure of these items.  (See Def. Counsel Affirm. in Support of Def. Oscar Rodriguez's Mot. for Severance and for Advance Disclosure, filed April 18, 2012 ("O. Rodriguez Aff."), at 4-5; see also Def. Daniel Fernandez's Omnibus Discovery Request, filed Dec. 23, 2011 ("Fernandez Req."), at 1-9 (making requests similar to those of Rodriguez, but specifying no timeframe).) Defendant Daniel Fernandez also requests that the Court require the Government to provide written notice of any evidence it intends to use under Rules 609(b) and 807(b) of the Federal Rules of Evidence.  (Fernandez Req. at 4, 7.)  In view of the breadth of the conspiracy charged and the large volume of discovery produced in this case, the Government agrees to supply notice of evidence it intends to introduce pursuant to Rules 404(b), 609(b), and 807(b), and expert notice six weeks before trial, and to provide the defense with a tentative exhibit list with any relevant recordings in the same time frame.  Earlier disclosure than that is not warranted here.

**VI.  THE COURT SHOULD DENY THE MOTIONS SEEKING EARLY DISCLOSURE OF COOPERATOR IDENTITIES AND JENCKS ACT AND *GIGLIO* MATERIALS**

The Court should deny Rodriguez's demand for an order directing the Government to make disclosures under the Jencks Act, 18 U.S.C. § 3500, and Giglio v. United States, 405 U.S. 150 (1972), six weeks before trial, and Oscar Rodriguez's similar request for a directive ordering the Government to disclose Jencks Act and Giglio material and the identities and criminal histories of any cooperating witnesses no later than sixty days before trial.  (See O. Rodriguez Aff. at 5.)

Criminal defendants generally are not entitled to disclosure of the Government's list of witnesses in advance of trial.  See United States v. Bejasa, 904 F.2d 137, 139 (2d Cir. 1990) ("Federal Rule of Criminal Procedure 16 does not require the Government to furnish the names and addresses of its witnesses."); United States v. Gasparik, 141 F. Supp. 2d 361, 365 (S.D.N.Y. 2001) ("It is well settled that a defendant has no general right to pretrial disclosure of the Government's witnesses.").  Giglio requires disclosure of any materials that might be used to impeach Government witnesses only "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously," United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007), and the Jencks Act requires no more than that the Government disclose

written statements of any witnesses in advance of cross-examination of those witnesses, 18 U.S.C. § 3500.  As Judge Batts recently observed, the Second Circuit has held that "a court which orders early disclosure of Jencks material clearly exceeds its authority."  United States v. Seabrook, No. 10 Cr. 87 (DAB), 2010 WL 5174353, at *3 (S.D.N.Y. Dec. 14, 2010) (citing United States v. Coppa, 267 F.3d 132, 145-46 (2d Cir. 2001)).  The Government's usual practice in this District is to turn over both Giglio and Jencks Act material the Friday before trial begins.[10]

As a courtesy, however, and in view of the potentially large volume of materials relating to the Government's witnesses, the Government agrees in this case to produce Giglio and Jencks Act material, including the identity and criminal

---

[10] The Jencks Act by its terms provides for less timely production:  "(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use. . . ."  18 U.S.C. § 3500.

histories of any cooperating witnesses, one week before trial.
Cf. United States v. King, No. 10 Cr. 122 (JGK), 2011 WL
1630676, at *7 (S.D.N.Y. Apr. 27, 2011) (approving one-week-
prior-to-trial schedule for Giglio and Jencks Act materials in
extremely complicated case which included one count of
embezzlement, eleven counts of money laundering, and four counts
of tax evasion).

**CONCLUSION**

For the foregoing reasons, the Government respectfully
requests that the Court DENY the defendants' motions to
suppress, DENY Rodriguez's motion to dismiss Count Two of the
S12 Indictment, DENY Rodriguez's motion for a hearing and other
unspecified relief in connection with his suspicions related to
a Deputy U.S. Marshal, and DENY the motions filed by Rodriguez,
Oscar Rodriguez, and Daniel Fernandez for early cooperator
identity, Jencks Act, and Giglio disclosures.  The Government
agrees that the Court should GRANT Espinal's motion to sever
Count Three of the S20 Indictment from Counts One and Two
thereof, and consents to entry of a pre-trial order requiring
disclosure, six weeks in advance of trial, of any evidence the
Government intends to present pursuant to Rules 404(b), 609(b),
and 807(b), any expert the Government intends to call, and a

tentative exhibit list identifying relevant recordings and

accompanying transcripts.

DATED:      New York, NY
            April 27, 2012


                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                        By: _____/s/_____
                              Sarah E. McCallum
                              Amie N. Ely
                              Sarah E. Paul
                              Assistant U.S. Attorneys
                              Tel: (212) 637-1033/2214/2326