UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUG 1 6 2012
```

UNITED STATES OF AMERICA

-v-                                                      No. 10 Crim. 905 (LTS)

MANUEL RODRIGUEZ-PEREZ et al.,

                            Defendants.

----------------------------------------------------------------X

MEMORANDUM ORDER

This is a marijuana conspiracy and money laundering case involving more than

fifty defendants.  Before the Court are the following motions: (1) a motion, filed by defendant

Manuel Geovanny Rodriguez-Perez ("Rodriguez-Perez"), to suppress wiretap intercepts and the

evidence derived therefrom, dismiss Count Two of the Twelfth Superseding Indictment ("S12

Indictment"), and produce certain discovery in advance of trial[1] (docket entry no. 622); (2) a

motion, also filed by Rodriguez-Perez, requesting a hearing to address Rodriguez-Perez's

suspicion that a U.S. Marshal unlawfully entered his residence (docket entry no. 624); (3) an

omnibus discovery request, filed by defendant Daniel Fernandez ("Fernandez") (docket entry no.

635); (4) a motion, filed by defendant Jose Manuel Espinal ("Espinal"), to suppress wiretap

intercepts and the evidence derived therefrom, and to sever the trial of Count Three of the

Twentieth Superseding Indictment in this case ("S20 Indictment") from that of Counts One and

--------------------------------------

[1]        This motion is filed on behalf of all defendants listed in the Twelfth Superseding
           Indictment ("S12 Indictment").

Two thereof (docket entry no. 735); and (5) a motion, filed by defendant Oscar Rodriguez ("O.

Rodriguez"), to sever his trial from those of his co-defendants and for an order requiring the

disclosure of Jencks Act material and Federal Rule of Evidence 404(b) information.  (Docket

entry no. 769).[2]

   The Court has considered carefully all the parties' submissions.  For the reasons

explained below, the motions are granted in part and denied in part.

I.  <u>Rodriguez-Perez and Espinal's Motions to Suppress Electronic Surveillance Evidence</u>

   Rodriguez-Perez and Espinal move to suppress all electronic surveillance

evidence, and its fruits, on the grounds that the wiretap applications failed to comply with the

statutory requirement that they include "a full and complete statement as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be unlikely

to succeed if tried or to be too dangerous."  18 U.S.C.A. § 2518(1)(c) (West 2011).[3]  In addition,

Rodriguez-Perez requests a hearing, pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), to

---

[2]   In addition, defendant Daniel Fernandez has filed a motion to adopt the arguments of his co-defendants to the extent he has standing. (<u>See</u> docket entry no. 641.)  Under Title III, only an "aggrieved person" may seek to suppress oral communications intercepted by the Government.  <u>See</u> 18 U.S.C.A. 2518(10)(a) (West 2011); <u>United States v. Fury</u>, 554 F.2d 522, 525 (2d Cir. 1977).  Title III defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed."  18 U.S.C.A. § 2510(11) (West 2011); <u>see also United States v. Bianco</u>, 998 F.2d 1112 (2d Cir. 1993), <u>abrogated on other grounds by</u> <u>Groh v. Ramirez</u>, 540 U.S. 551 (2004) (intercepted defendants have standing to challenge wiretaps).  Fernandez does not explain if or how he qualifies as an "aggrieved person."  However, because the Court finds that the wiretap applications were sufficient, Fernandez's failure to demonstrate his standing to challenge the wiretap evidence is a moot point.

[3]   Neither Defendant challenges the wiretap applications' averments of probable cause.

address what he characterizes as "false or grossly misleading assertions" in the application authorizing the wiretaps of his phones.

      A.    <u>Factual Background</u>

          1.    <u>Rodriguez-Perez Wiretaps</u>

      In February 2009, the Department of Homeland Security's Immigration and Customs Enforcement Agency ("ICE"), and other federal agencies, began investigating a narcotics trafficking and money laundering organization that was distributing large quantities of marijuana throughout the greater New York City area.  (<u>See</u> Affidavit of Special Agent Jason S. Samuels in Support of Application for Case Authorization to Intercept Wire Communications, dated January 7, 2010 ("Samuels Aff. 1") ¶ 15.)  In the following months, a Justice of the Supreme Court of the State of New York, and two judges in this District, authorized the interception of communications over telephones used by several individuals who were ultimately charged in this case.  (<u>Id</u>. ¶ 17.)  Those interceptions revealed, among other things, that two individuals – Kenneth Pena and his brother Ariel Pena – were arranging with a person later identified as Rodriguez-Perez to conduct a narcotics transaction on December 3, 2009, in exchange for a $25,000 payment.  (<u>Id</u>.)  After surveilling the December 3 meeting, agents conducted a stop of the vehicle Rodriguez-Perez was driving, confirmed his identity, and conducted a search that revealed a bag containing approximately $25,000.  (<u>Id</u>. ¶¶ 24-29.) Rodriguez-Perez told agents that the money was from a restaurant and was "legit."  (<u>Id</u>. ¶ 27.) The agents then allowed Rodriguez-Perez to leave.

      On January 7, 2010, the Government sought authorization to intercept communications over the cell phone that Rodriguez-Perez had used to arrange the December 3, 2009, transaction.  In support of its application, the Government submitted an affidavit by FBI

Agent Jason Samuels ("Agent Samuels"), which sets forth the requisite probable cause (id. ¶¶ 18-29), and certifies that "several other investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ." (Id. ¶ 34.)  The Affidavit then describes the following limitations with respect to each technique.

Physical surveillance: Agent Samuels noted that "[a] significant amount of physical surveillance" had been undertaken, including the surveillance that had resulted in the seizure of $25,000 from Rodriguez-Perez on December 3, 2009.  However, the affidavit explains, efforts to surveil Rodriguez-Perez "at and near the location of" his supposed home address had failed.  (Id. ¶ 35.)  Agent Samuels further observed that, because Rodriguez-Perez did not appear to handle narcotics personally, physical surveillance of Rodriguez-Perez would be unlikely to reveal the location of the narcotics.  (Id. ¶ 36.)  Finally, Agent Samuels explained that physical surveillance is of limited value in narcotics investigations, as it "provides limited direct evidence of the significance of [any] meetings" between suspected co-conspirators.  (Id. ¶ 37.)

Telephone Records: Agent Samuels explained that, although telephone toll and subscriber records had been obtained and used in the investigation, they were of limited use because (1) much of the subscriber information provided was fictitious and, thus, incapable of revealing the true identities of the suspected co-conspirators, and (2) the records convey no information about the content of the communications.  (Id. ¶ 40.)

Prior Wire Surveillance: Agent Samuels noted that the prior wiretaps had "revealed a significant marijuana distribution network in New York City and a transportation cell from Florida to New York," but that they had "not revealed the identities of the drivers and full extent of the activities of the transportation cell."  (Id. ¶ 41.)

Undercover Officers ("UCs"): Agent Samuels noted there was "no expectation that

an undercover officer will be able to be introduced into the organization or to determine the full scope" of the suspects' operation.  (Id. ¶ 42.)  He explained that, "[b]ased on [his] experience as a narcotics investigator," the targets would be "unlikely to discuss the full extent of their organization's activities or membership when dealing with an 'outsider' such as an undercover officer."  (Id.)

Confidential Informants ("CIs"): Agent Samuels noted that no CIs had been used in the investigation; he also revealed that agents had made use of an incarcerated witness possessing information about Rodriguez-Perez, but that this witness was only useful as a source of historical evidence and could not serve as an active informant.  (Id. ¶ 43.)  Agent Samuels further explained that, as with UCs, information from a CI was likely to be of limited value, given the scope of the organization.  (Id. ¶ 44.)

Federal Grand Jury: Agent Samuels explained that a grand jury investigation would not be useful in obtaining the kind of evidence needed to prove the membership and activities of a narcotics trafficking conspiracy for a number of reasons, among them (1) any witness whose testimony would be useful had either yet to be identified or was a target of the investigation and therefore unlikely to testify freely, and (2) issuing grand jury subpoenas to participants in the conspiracy would alert the targets that they were being investigated, and thus threaten the effectiveness of any ongoing investigative activities.  (Id. ¶ 45.)

Search Warrants and Seizures: Agent Samuels noted that agents had executed one search warrant on a "stash house," and that the search had yielded $76,672 in marijuana proceeds and approximately 22 pounds of marijuana.  Agent Samuels explained, however, that execution of further warrants either was impossible because other stash locations had yet to be identified, or counterproductive because it would alert targets and cause them to flee and/or destroy evidence.

(Id. ¶¶ 46-47.)

Arrests: Agents Samuels noted that arrests at that early stage would frustrate efforts to obtain more information about the scope, membership, and activities of the conspiracy. By way of example, Agent Samuels cited the fact that the detention of Jose Ramon Perez in November 2009 (by law enforcement authorities who were not related to this investigation) had apparently caused Perez and others to drop their phones.  (Id. ¶ 49.)

Having determined that the Government's application demonstrated probable cause that Rodriguez-Perez's cell phone was being used to conduct narcotics activity, and that "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried," 18 U.S.C. § 2518(3)(c), Judge Daniels authorized the requested interception.  Over the interception period, which lasted from January 7, 2010 to January 19, 2010, agents intercepted several calls in which Rodriguez discussed narcotics transactions with his customers.  (See Affidavit of Special Agent Jason S. Samuels in Support of Application for Authorization to Intercept Wire Communications, dated January 22, 2010 ("Samuels Aff. 2") ¶ 30.)

2.     Subsequent Rodriguez-Perez Wiretaps

Rodriguez-Perez dropped this cell phone on January 19, 2010, apparently on suspicion that he was being surveilled by law enforcement.  (Id. ¶¶ 32-34.)  On January 22, 2010, the Government sought authorization to intercept communications over a different phone in Rodriguez-Perez's use.  In support of this application, Agent Samuels submitted an affidavit in which he provided many of the same explanations concerning the inadequacy of alternative investigative techniques that he had offered in his January 7, 2010, affidavit.  He also added that (1) Rodriguez-Perez was highly attuned to surveillance (as evidenced by his dropping of the first

phone), thereby making surveillance unduly risky (id. ¶ 41); (2) some additional physical surveillance had been undertaken of a "stash house," but the information yielded as a result was limited (id. ¶ 43 n.11); and (3) the incarcerated defendant referred to in the first wiretap application had "informed other law enforcement agents that RODRIGUEZ[-PEREZ] is a large-scale marijuana trafficker and controls several 'spots' in New York City where marijuana is sold." (Id. ¶ 49). On January 22, 2010, Judge Chin authorized interception of communications over the second Rodriguez-Perez cell phone. Interception commenced that day and continued until February 12, 2010, when Rodriguez-Perez dropped that phone. (See Affidavit of Special Agent Jason S. Samuels in Support of Application for Authorization to Intercept Wire Communications, dated February 25, 2010 ("Samuels Aff. 3") ¶ 17(I).) During the period of interception, agents heard Rodriguez-Perez discussing narcotics transactions with several co-conspirators and heard him intimating that he would use violence against those who owed him drug debts. (Id. ¶ 36.) During this same period, Rodriguez-Perez was heard referring to a telephone number he used while in Florida; the Government used toll records to ascertain the number for that Florida phone. (Id. ¶ 37(a).)

On February 25, 2010, the Government sought authorization to intercept two additional telephones: the Florida phone that Rodriguez-Perez had referenced, and the new phone he was using to talk to customers after dropping his previous phone on February 12, 2010. In the supporting affidavit, Agent Samuels stated that Rodriguez-Perez used different cell phones to speak with different groups, and that he changed his phone numbers often to avoid detection by law enforcement. (Id. ¶¶ 39-40.) Agent Samuels repeated the reasons why less invasive investigative techniques had failed and/or would be unlikely to succeed, adding references to additional investigative efforts that had been made since the last authorization was sought. (Id.

¶ 45.)  That application was granted by Judge Scheindlin and re-authorized by Judge Kaplan.

Thereafter, the Government continued to file interception applications, proffering substantially

same justifications.  Interception continued until October 14, 2010.

3.    Espinal Wiretaps

While the Government was intercepting communications over Rodriguez-Perez's

phones, agents learned that Rodriguez-Perez and Espinal – who was the target of a bribery

investigation in an unrelated case – were co-signatories on a bank account.  (Affidavit of Special

Agent Jason S. Samuels in Support of Application to Intercept Wire Communications, dated July

19, 2010 ("Samuels Aff. 5") ¶¶ 54, 56-59.)  Agents further learned that Rodriguez-Perez and

Espinal had been engaged in certain real estate transactions together (id. ¶ 55), and observed that

Rodriguez-Perez was talking to Espinal over a new phone (the "money phone") in circumstances

and at times that supported the hypothesis that Espinal was helping Rodriguez-Perez launder

proceeds of narcotics trafficking.  (Id. ¶ 62.)  Based on this information, the Government, on July

19, 2010, sought and was granted authorization to intercept communications over Rodriguez-

Perez's money phone.

Interceptions over Rodriguez-Perez's money phone yielded evidence that Espinal

and Rodriguez-Perez had conspired together to launder narcotics proceeds through investments in

real estate.  (Affidavit of Special Agent Jason S. Samuels in Support of Application for

Authorization to Intercept Wire Communications, dated September 23, 2010 ("Samuels Aff. 7")

¶ 44.)  Based on these interceptions and other evidence, the Government sought authorization to

intercept communications over Espinal's own phone.  In his September 23, 2010, affidavit, Agent

Samuels discussed the limitations of each of the usual procedures and techniques employed in

drug trafficking investigations.

<u>UCs and CIs</u>: Agent Samuels explained that it was unlikely that either Rodriguez-Perez or Espinal would discuss their money laundering activities with non-participants.  He also noted that a cooperating defendant and other informants had provided historical information regarding Rodriguez-Perez, but that those sources were unable to provide contemporary intelligence.  (<u>Id.</u> ¶ 48(a).)

<u>Visual Surveillance</u>: Agent Samuels detailed the surveillance that had been done on Rodriguez-Perez and on Espinal, as well as on certain properties implicated in their suspected money laundering scheme, but explained that physical surveillance was of limited utility in "money laundering investigations like this one that involve real estate transactions and investigations of political corruption, where investigators are unlikely to be able to witness corrupt transactions occurring in public places."  (<u>Id.</u> ¶ 48(b).)

<u>Use of Telephone Toll Records</u>: Agent Samuels explained that toll records were of limited utility because they revealed only the fact of contact between co-conspirators and not the content or nature of the communications.  (<u>Id.</u> ¶ 48(c).)

<u>Federal Grand Jury</u>: Agent Samuels explained that a federal grand jury and witness interviews would be of limited value because any witnesses with useful information would themselves have criminal exposure, and would therefore be unlikely to give non-immunized testimony.  (<u>Id.</u> ¶ 48(d).)  He also observed that, although document subpoenas had been used to collect valuable evidence, they were "insufficient to fully determine the methods and means used" by the co-conspirators or their mutual "understandings."  (<u>Id.</u> ¶ 48(e).)

<u>Search Warrants and Arrests</u>: Agent Samuels stated that execution of search warrants would be premature, both because there was insufficient indication that incriminating materials were located at any specific property, and because any such searches would disclose the

existence of the covert operation.  (Id. ¶ 48(f).)  Agent Samuels similarly explained that arrests

would compromise the secrecy of the investigation.  (Id. ¶ 48(g).)

              Prior Interceptions:  Agent Samuels explained that prior interceptions had focused

principally on Rodriguez-Perez and others' narcotics activities; that the interception of

Rodriguez-Perez's money phone had failed to reveal Espinal's contacts with the individual he

was suspected of having bribed; and that the interception had not revealed Espinal's contacts with

co-conspirators who were helping him launder Rodriguez-Perez's narcotics proceeds.  (Id.

¶ 48(h).)

              Based on the above submission, Judge Preska authorized interception of

communications over Espinal's phone on September 23, 2010.  Interception began on or about

that date and terminated on or about October 23, 2010.

      B.      Legal Standard for Adequacy of Wiretap Application

              Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), 18

U.S.C. § 2510 et seq., sets forth procedures for the interception of oral communications.  An

application for electronic surveillance must include, among other things, "a full and complete

statement as to whether or not other investigative procedures have been tried and failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C.A.

§ 2518(1)(c) (West 2011).[4]  "[G]eneralized and conclusory statements that other investigative

---

[4]      "[T]raditional investigative techniques include '(1) standard visual and aural
surveillance; (2) questioning and interrogation of witnesses or participants
(including the use of grand juries and the grant of immunity if necessary); (3) use
of search warrants; and (4) infiltration of conspiratorial groups by undercover
agents or informants,' as well as 'pen registers and trap and trace devices.'"
United States v. Cline, 349 F.3d 1276, 1280 (10th Cir. 2003) (quoting United
States v. VanMeter, 278 F.3d 1156, 1163-64 (10th Cir. 2002)).

procedures would prove unsuccessful" will not suffice.  U.S. v. Lilla, 699 F.2d 99, 104 (2d Cir.

1983).  However, this statutory requirement "is far from an insurmountable hurdle and only

requires that the Government demonstrate that normal investigative techniques would prove

difficult."  United States v. Labate, No. 00 Cr. 632(WHP), 2001 WL 533714, at *13 (S.D.N.Y.

May 18, 2001) (quotation marks and citations omitted).  As the Second Circuit has stated:

> [T]he purpose of the statutory requirements is not to preclude resort to electronic
> surveillance until after all other possible means of investigation have been
> exhausted by investigative agents; rather, they only require that the agents inform
> the authorizing judicial officer of the nature and progress of the investigation and
> of the difficulties inherent in the use of normal law enforcement methods.

United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) (quoting United States v. Vazquez, 605

F.2d 1269, 1282 (2d Cir. 1979) (quotation marks and citation omitted)).  To this end, all that is

required is "a reasoned explanation, grounded in the facts of the case, and which squares with

common sense."  United States v. Bellomo, 954 F. Supp. 630, 639 (S.D.N.Y. 1997) (quoting

United States v. Ianniello, 621 F. Supp. 1455, 1465 (S.D.N.Y.), aff'd 808 F.2d 184 (2d Cir.

1985)).  Applying this commonsense approach, courts have regularly "approved of wiretaps in

complex and sprawling criminal cases involving large conspiracies."  United States v.

Concepcion, 579 F.3d 214, 218 (2d Cir. 2009) (citing United States v. Torres, 901 F.2d 205, 232

(2d Cir. 1990)).

        The defendant bears a significant burden when seeking to suppress an authorized

wiretap: once the authorizing judge has made the requisite probable cause and necessity

determinations, any court reviewing those determinations must grant "considerable deference" to

the authorizing judge.  Concepcion, 579 F.3d at 217 & n.1; accord United States v. Yannotti, 541

F.3d 112, 124 (2d Cir. 2008).  The reviewing court's role is limited to "decid[ing] if the facts set

forth in the application were minimally adequate to support the determination that was made."

Yannotti, 541 F.3d at 124 (quoting United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997)).

      C.      Rulings on Motions to Suppress Wiretap Evidence

            1.      Rodriguez-Perez Motion to Suppress the Wiretaps is Denied

Rodriguez-Perez advances several arguments in support of his motion to suppress the wire communications.  First, he accuses Agent Samuels of deliberately withholding the information that the incarcerated informant provided to authorities and argues that the omission of that information rendered the application insufficient.  However, the affidavit clearly states that the information the CI provided was historical in nature and that the Government's ongoing investigation required a wiretap to collect contemporary intelligence.  Thus, the precise content of the incarcerated informant's dated information was not relevant to the necessity inquiry.

Next, Rodriguez-Perez posits that the application exaggerated the risks that arrests, seizures, and search warrants would imperil the investigation by causing suspects to alter their behavior.  Common sense dictates that a typical conspirator, cognizant that her or she is the target of an ongoing investigation, will act differently from one who is oblivious.  In fact, as the affidavit notes, Rodriguez-Perez dropped at least one phone in the course of the investigation when he realized law enforcement officers were surveilling him.  Accordingly, the Court finds that the affidavit reasonably characterized the inadequacies of arrests, seizures, and search warrants as alternatives to wiretaps.

Rodriguez-Perez also argues that the affidavit contains several fatal contradictions.  The "contradictions" he identifies, however, are either illusory or inconsequential.  For example, Rodriguez-Perez seizes on Agent Samuel's statements that the "investigation" into Rodriguez-Perez's activities began "in or about February 2009," and argues that this contradicts the agent's representation that "surveillance" of Rodriguez-Perez began in December 2009.  However, there

is nothing extraordinary about a few months elapsing between the opening of an investigation and the commencement of surveillance.  Rodriguez-Perez also claims that the Government's timeline is inconsistent because the agents apparently knew that Rodriguez-Perez was a participant on a November 24, 2009, call – six weeks before the Government tapped his phone.  Here, too, the accusation that the Government contradicted itself is spurious: the Government explains that, once Rodriguez-Perez was identified as a target, agents revisited the wiretap recordings they had obtained through the interception of Ariel Pena's phone in November 2009 and located the November 24 call with Rodriguez-Perez.

   Rodriguez-Perez also asserts that the affidavit failed to establish the necessity of electronic surveillance because, rather than address the efficacy of the alternative investigative techniques combined, the affidavit explained the inadequacy of each technique in isolation.  Such an argument could be meritorious if Rodriguez-Perez could show that a deficiency in any given technique could be overcome by using other techniques in concert.  The affidavit, however, explains how certain gaps in the investigation could not be practicably filled through means other than wiretaps, and Rodriguez-Perez fails to even attempt to make a showing that the use of multiple techniques at once could overcome their individual shortcomings.

   Finally, Rodriguez-Perez claims that the Government's necessity foundation was lacking because agents could have conducted further physical surveillance by, for example, following truck drivers who had been observed carrying loads of marijuana and cash proceeds.  As an initial matter, the affidavit explains that the Government <u>did</u> surveil truck drivers.  In any event, this is precisely the sort of "Monday morning quarterbacking" that courts routinely reject.  <u>See</u> <u>United States v. Ship</u>, 578 F. Supp. 980, 989 (S.D.N.Y. 1984) ("Monday morning quarterbacking as to what investigative techniques the agents should have employed in addition to

what they did employ is utterly unrealistic, if not naive."), aff'd United States v. Wilkinson, 754

F.2d 1427 (2d Cir. 1985); accord United States v. Bernardino, 07 Cr. 151(PKC), 2007 WL

4462176, at *2 (S.D.N.Y. Dec. 17, 2007).

        Accordingly, the Court finds that the wiretaps were properly authorized and denies

Rodriguez-Perez's motion to suppress the evidence obtained therefrom.  Rodriguez-Perez also

requests that this Court hold a Franks hearing to address the supposed misrepresentations and

contradictions in the wiretap application.  Such a hearing is warranted only where the movant

"establishes intentional or reckless omissions or false statements that are 'necessary to the finding

of probable cause.'"  United States v. Miller, 116 F.3d 641, 664 (2d Cir. 1997) (quoting Franks v.

Delaware, 438 U.S. 154, 156 (1978)).  Having made no showing of any such misrepresentation or

omission, Rodriguez-Perez's request for a Franks hearing is denied.

        2.    Espinal's Motion to Suppress the Wiretaps is Denied

        As with the Rodriguez-Perez wiretap applications, the Espinal wiretap application

contained a detailed affidavit in which the testifying agent provided explanations as to why

wiretaps were needed to reveal the full scope of the narcotics conspiracy and why alternative

investigative techniques were insufficient.  Espinal, however, posits several defects in the wiretap

application.  He first argues that the agent's explanation regarding the inadequacy of CIs or UCs

was defective because it did not explicitly reference bribery, the crime for which Espinal was

originally being investigated.  This argument is meritless.  First, it is factually inaccurate: the

affidavit explains that CIs and UCs could not reveal the full extent of the suspects' commission of

the "target offenses" – a phrase that is defined elsewhere to encompasses both money laundering

and bribery.  (Samuels Aff. 7 ¶ 48(a).)  Moreover, the agent's explanation as to the insufficiency

of CIs and UCs (e.g., the low likelihood that Espinal would discuss criminal activities with an outsider) are plainly applicable to both the money laundering and bribery charges.

Espinal next claims that the affidavit contradicts itself by stating that "the investigation has not made use of a confidential informant or an undercover officer," and then in the same paragraph, that "informants have provided [the agent] background on RODRIGUEZ[-PEREZ]." (Samuels Aff. 7 ¶ 48(a)). This apparent contradiction is, at worst, the product of inartful phrasing. Viewed in context, the agent's meaning is clear: an incarcerated informant had provided background information on Rodriguez-Perez, but the Government had not made use of CIs or UCs who were able to provide up-to-date intelligence. The fact that the Government had obtained historical information from an incarcerated individual did not obviate the need for a wiretap and, thus, cannot form a basis for suppressing the resulting evidence.

Espinal also argues that Agent Samuels failed to provide a factual basis for his conclusion that a federal grand jury would not be a promising method of investigation. However, Agent Samuels provided numerous justifications, among them: (1) that useful witnesses who could provide information to the grand jury had not been identified; (2) that the issuance of grand jury subpoenas would risk alerting the target subjects to the pendency of the investigation; and (3) that the business and financial records that could be obtained would be "insufficient to fully determine the methods and means used by ESPINAL and other TARGET SUSPECTS to commit the TARGET OFFENSES, along with the understandings among the TARGET SUBJECTS to commit the TARGET OFFENSES." (Id. ¶ 48(d).)

Finally, Espinal questions Agent Samuels' judgment that executing search and arrest warrants would thwart the investigation. He speculates that the December 2009 stop of Rodriguez-Perez had already alerted his co-conspirators that they were under investigation.

However, even if Rodriguez-Perez knew that he was being investigated for drug distribution, that does not mean he was aware of the investigation into the joint money laundering scheme. Espinal's conjecture is not enough to compel the Court to second-guess Agent Samuels' judgment.

Accordingly, the Court finds that the wiretap of Espinal's phone was properly authorized and denies the motion to suppress. As with Rodriguez-Perez's motion, the Court finds that Espinal has failed to make the showing required to warrant holding a <u>Franks</u> hearing.

II.      <u>The Motion to Dismiss Count Two of the S12 Indictment is Denied</u>

Rodriguez-Perez moves to dismiss Count Two of the S12 Indictment on grounds of insufficient pleading and multiplicity. Count One of the S12 Indictment charges Rodriguez-Perez and others with a conspiracy to distribute and possess with intent to distribute 1,000 kilograms and more of marijuana from 1992 to October 2010; Count Two charges a smaller subset of individuals, including Rodriguez-Perez, with the same conduct.

The two charges are clearly multiplicitous. However, as even Rodriguez-Perez recognizes, dismissal of charges as multiplicitous is premature at this stage. The Second Circuit has made clear that "[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." <u>United States v. Josephberg</u>, 459 F.3d 350, 355 (2d Cir. 2006). Where a jury convicts a defendant on multiplicitous counts, "the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." <u>Id</u>.

As for Rodriguez-Perez's argument that Count Two is inadequately pled, an indictment is sufficient "when it charges a crime with sufficient precision to inform the defendant

of the charges he must meet and with enough detail that he may plead double jeopardy in a future

prosecution based on the same set of events." United States v. Stavroulakis, 952 F.2d 686, 693

(2d Cir. 1999).  To satisfy this test, an indictment need do "little more than track the language of

the statute charged and state the time and place (in approximate terms) of the alleged crime."

United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975).  The indictment need not allege

any overt act.  See United States v. Shabani, 513 U.S. 10, 17 (1994).

        Count Two tracks the language of the statute and identifies the time frame and

venue.  Moreover, while Count Two itself does not list overt acts, many of the overt acts (37 out

of 55, by the Government's count) listed in Count One were allegedly undertaken by the subset of

conspirators who are charged in Count Two, and many of those alleged acts were undertaken by

Rodriguez-Perez himself.  Thus, viewed holistically, there can be no question that the S12

Indictment properly apprises Rodriguez-Perez of the charges against him.  See United States v.

Walsh, 194 F.3d 37, 45 (2d Cir. 1999) ((in reviewing an indictment for sufficiency, a court

reviews the indictment "as a whole").

III.    Rodriguez-Perez's Request for Hearing On U.S. Marshal Allegations

        Rodriguez-Perez requests a hearing to determine whether a United States Marshal

gained illegal entry into his apartment.  Rodriguez-Perez states as follows in his affidavit: shortly

after he moved into an apartment in "late 2007 or early 2008," a man and a woman moved into an

apartment on the same floor.  (Affidavit of Manuel Rodriguez-Perez ("Rodriguez-Perez Aff.")

¶ 3, docket no. 626).  Several months prior to his arrest, he "began to notice . . . that on some

occasions when [he] returned home the bottom lock on [his] door," which he always locked when

he exited, was unlocked, and that "things in [his] apartment had been moved around."  (Id. ¶ 4.)

A week before he was arrested, the man and woman moved out of their apartment.  (Id. ¶ 5.)

After his arrest, he was brought to the U.S. Marshal's office in the courthouse, where he discovered that the man who occupied the apartment was a U.S. Marshal.  (Id. ¶ 6.)  The U.S. Marshal told Rodriguez-Perez that he played no role in his investigation or arrest.  (Id. ¶ 7.)

Rodriguez-Perez's request for a hearing is, by his own admission, based on nothing more than coincidences that aroused his suspicion.  Rodriguez-Perez admits that he does "not know whether this marshal was involved in the investigation leading to [his] arrest, nor do[es] [he] know that [the marshal] surreptitiously entered [his] apartment" (id. ¶ 8), and there is nothing linking the U.S. Marshal to the investigation or any illicit entry other than the fact that he happened to reside in the same building.  Rodriguez-Perez does not challenge the validity of the search warrant executed at the apartment on October 15, 2010, nor allege that any supporting information in the affidavit was based on evidence obtained by the U.S. Marshal.[5]  "[A] conclusory allegation unsupported by any facts and based solely upon suspicion and conjecture, . . . is insufficient to warrant a hearing."  United States v. Wallace, No. 97 Cr. 975(RWS), 1998 WL 401534, at *10 (S.D.N.Y. July 17, 1998).  Accordingly, the request for a hearing is denied.

IV.   Remaining Issues

Espinal has requested that the Court sever the trials of Counts One and Two of the S20 Indictment from that of Count Three.  The Government has consented to that request.  The request is therefore granted.

The Government has agreed to supply notice pursuant to Rules 404(b), 609(b), and 807(b), expert notice, and a tentative exhibit list with any relevant translations of recordings six weeks in advance of trial.  None of the Defendants who have requested discovery has objected to

---

[5]     This search revealed, among other things, a bulletproof vest, over $100,000 cash, rubber bands consistent with those used to bundle bulk cash, and a drug ledger.

that time frame.  Accordingly, Defendants' requests are deemed moot.  Defendants will be given

an opportunity to make further arguments with respect to discovery if necessary.

Rodriguez-Perez, O. Rodriguez, and Fernandez request an order directing the

Government to make early disclosures under the Jencks Act, 18 U.S.C. § 3500, and Giglio v.

United States, 405 U.S. 150 (1972).[6]  Giglio requires disclosure of any materials that might be

used to impeach Government witnesses "in sufficient time that the defendant will have a

reasonable opportunity to act upon the information efficaciously."  United States v. Rodriguez,

496 F.3d 221, 226 (2d Cir. 2007).  The Jencks Act requires only that the Government disclose

written statements of any witness in advance of his or her cross-examination.  18 U.S.C. § 3500.

The Second Circuit has held that a court exceeds its authority where it orders early disclosure of

Jencks Act material.  United States v. Coppa, 267 F.3d 132, 145-46 (2d Cir. 2001).

The Government has confirmed that it is aware of its obligations under Giglio and

the Jencks Act, and indicated that it intends to make Giglio and Jencks Act material available to

the Defendants one week before trial.  These representations are sufficient at this juncture.  See

United States v. Vega, 309 F. Supp. 2d 609, 617 (S.D.N.Y. 2004); cf. United States v. King, No.

10 Cr. 122(JGK), 2011 WL 1630676, at *7 (S.D.N.Y. Apr. 27, 2011) (approving

one-week-prior-to-trial schedule for Giglio and Jencks Act materials in complicated

embezzlement/tax evasion/money laundering case).  The precise timing of the Section 3500

disclosures can be discussed in connection with the scheduling of the trial.  Accordingly,

---

[6]     Rodriguez-Perez requests these materials be disclosed six weeks in advance of
trial; O. Rodriguez requests disclosure 60 days before trial; Fernandez requests
disclosure "well in advance of trial" without giving a specific time frame.

Rodriguez-Perez, O. Rodriguez, and Fernandez's request for earlier disclosure of <u>Giglio</u> and Jencks Act materials is denied.

C<small>ONCLUSION</small>

For the foregoing reasons, Rodriguez-Perez's motion to suppress is denied. Espinal's motion to suppress is denied. Rodriguez-Perez's motion to dismiss Count Two of the S12 Indictment is denied. Rodriguez-Perez's motion for a hearing on his suspicion concerning surreptitious entry by a U.S. Marshal is denied. Espinal's motion to sever the trial of Count Three from that of Counts One and Two of the S20 Indictment is granted. In light of the Government's representation that it will supply notice pursuant to Federal Rules of Evidence 404(b), 609(b), and 807(b), expert notice, and a tentative exhibit list with any relevant translations of recordings six weeks in advance of trial, those requests are deemed moot. In light of the Government's representations that it will provide Jencks Act and <u>Giglio</u> materials one week prior to trial, Rodriguez-Perez, O. Rodriguez, and Fernandez's requests for early disclosure of Jencks Act and <u>Giglio</u> materials are denied.

This Memorandum Order resolves docket entries nos. 622, 624, 635, 641, 735, and 769.

SO ORDERED.

Dated: New York, New York
      August 16, 2012

LAURA TAYLOR SWAIN
United States District Judge